## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| HOBBY LOBBY STORES, INC., *et al.*,    ) | |
|                       ) | |
|           Plaintiffs,    ) | |
| vs.                        ) | NO. CIV-12-1000-HE |
|                       ) | |
| KATHLEEN SEBELIUS, in her official ) | |
| capacity as the Secretary of the United ) | |
| States Department of Health and Human ) | |
| Services, *et al.*,            ) | |
|                       ) | |
|          Defendants.    ) | |

## ORDER

Plaintiffs, Hobby Lobby Stores, Inc., Mardel, Inc., David Green, Barbara Green, Steve Green, Mart Green and Darsee Lett sued Kathleen Sebelius, Secretary of the United States Department of Health and Human Services ("HHS"), and other government officials and agencies challenging regulations issued under the Patient Protection and Affordable Care Act, Pub.L. No. 111-148, 124 Stat. 119 (2010), as amended by the Heath Care and Education Reconciliation Act, Publ. L. No. 111-152, 124 Stat. 1029 (2010) ("Affordable Care Act" or "ACA"). Specifically, plaintiffs object to the preventive care coverage regulations or mandate which they allege forces them to "provide health insurance coverage for abortion-inducing drugs and devices, as well as related education and counseling." Complaint, ¶ 8. Plaintiffs contend the mandate violates their statutory and constitutional rights and seek both declaratory and injunctive relief. Presently at issue is plaintiffs' motion for preliminary injunction in which they ask the court to prohibit defendants from enforcing the mandate against them. A hearing on the motion was held on November 1, 2012.

This lawsuit is one of many challenging various aspects of the Affordable Care Act. While the legislation is controversial, as another judge has stated in similar circumstances, "this Court's personal views on the necessity, prudence, or effectiveness of the Affordable Care Act are of no moment whatsoever. The only issues concerning the ACA presently before this Court are those raised by the parties: namely, whether [the preventive services coverage provision] passes muster under the Constitution of the United States, and whether it violates the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq." Mead v. Holder, 766 F.Supp.2d 16, 19 (D.D.C. 2011), *aff'd on other grounds,* Nat'l Fed'n of Indep. Bus. v. Sebelius, ___U.S. ___ (2012).

Background

The ACA, signed into law on March 23, 2010, effected a variety of changes to the healthcare system.  The Act includes a preventive services provision which provides:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for ... (4) with respect to women, such additional preventive care and screenings ... as provided for in comprehensive guidelines supported by the Health Resources and Services Administration[1] for purposes of this paragraph.

42 U.S.C. § 300gg–13(a).  The Health Resources and Services Administration (HRSA) commissioned the Institute of Medicine (IOM) to develop recommendations for the HSRS guidelines. The IOM published a report which proposed, among other things, that insurance plans cover "[a]ll Food and Drug Administration approved contraceptive methods,

---

[1]*The Health Resources and Services Administration (HRSA) is an agency within HHS.*

sterilization procedures, and patient education and counseling for all women with reproductive capacity."[2]  Included among the FDA-approved contraceptive methods are diaphragms, oral contraceptive pills, emergency contraceptives such as Plan B and ulipristal, commonly known as the morning-after pill and the week-after pill, respectively, and intrauterine devices.[3]

On August 1, 2011, HRSA adopted IOM's recommendations in full, *see* 76 Fed.Reg. 46621; 45 C.F.R. § 147.130, and, on February 15, 2012, HHS, the Department of Labor and the Department of Treasury published rules finalizing the HRSA guidelines.  Unless grandfathered or otherwise exempt, employers' group health plans must provide coverage conforming with the guidelines for plan years beginning on or after August 1, 2012.  75 Fed.Reg. 41726, 41729.

Grandfathered health plans are not subject to the preventive services provision of the ACA. 75 Fed.Reg. 34538–01 (June 17, 2010).[4]  Some religious employers also are exempt from providing plans that cover contraceptive services.  To qualify as a "religious employer" an employer must satisfy the following criteria:

(1) The inculcation of religious values is the purpose of the organization; (2)

---

[2]*See http://www.hrsa.gov/womensguidelines/.*

[3]*See www.fda.gov/forconsumers/byaudience/forwomen/ucm118465.htm. FreePublications/UCM282014.pdf (last updated Aug. 2012).*

[4]*A grandfathered plan is one that was in existence on March 23, 2010, and which has not undergone any of a defined set of changes.  See 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140.  The government estimates that by 2013, a  majority of group health plans will lose their grandfathered status.*

3

The organization primarily employs persons who share the religious tenets of the organization; (3) The organization serves primarily persons who share the religious tenets of the organization; (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(I) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. § 147.130(a)(1)(iv)(B); 76 Fed.Reg. 46621–01, 46623.  A temporary enforcement safe-harbor provision applies to other non-profit organizations that do not qualify for any other exemption and "do not provide some or all of the contraceptive coverage otherwise required, consistent with any applicable State law, because of the religious beliefs of the organization." 77 Fed.Reg. 16501, 16502 (March 21, 2012); 77 Fed.Reg. 8725 (Feb. 15, 2012).[5]  Finally, an employer with fewer than 50 employees is not required to provide any health insurance plan.  26 U.S.C. § 4980H(c)(2)(A).

The individual plaintiffs (collectively the "Greens"), are members of a family that owns and operates Hobby Lobby Stores, Inc. and Mardel, Inc., privately held, for-profit corporations.  Hobby Lobby operates 514 arts and crafts stores in 41 states with 13,240 full-time employees.  Mardel is a bookstore and educational supply company that specializes in Christian materials.  It has 35 stores in 7 states with 372 employees.  Both Hobby Lobby and Mardel are operated through a management trust which owns all the voting stock in the corporations.[6]  Each member of the Green family is a trustee of the trust.

---

[5]*The government is in the process of finalizing amendments to the preventive services coverage regulations to accommodate the religious objections of non-exempt, non-grandfathered religious organizations to providing coverage for contraceptive services.  See 77 Fed.Reg. at 8728.*

[6]*It is not altogether clear from the parties' submissions whether Hobby Lobby and Mardel are wholly owned by the Green plaintiffs or just wholly controlled by them, with some portion of the non-voting, equity ownership of the companies held by others.  See Complaint, ¶38.  The*

Although Hobby Lobby and Mardel are for-profit, secular corporations, the Green family operates them according to their Christian faith. "As part of their religious obligations" the Green family provides health insurance coverage to Hobby Lobby's and Mardel's employees through a self-insured plan. Complaint, ¶52. However, "[t]he Green family's religious beliefs prohibit them from deliberately providing insurance coverage for prescription drugs or devices inconsistent with their faith, in particular abortion-causing drugs and devices. Hobby Lobby's insurance policies have long explicitly excluded – consistent with their religious beliefs – contraceptive devices that might cause abortions and pregnancy-termination drugs like RU-486." *Id.* at ¶¶ 53-54. The government does not dispute the sincerity of the Greens' beliefs.

Hobby Lobby and Mardel, as secular, for-profit companies, do not satisfy the ACA's definition of a "religious employer" and are ineligible for the protection of the safe-harbor provision. Their health plans also are not grandfathered under the Act. The mandate takes effect as to the corporations' employee health plan on January 1, 2013, as that is the date upon which the plan year begins. Plaintiffs assert that they "face an unconscionable choice: either violate the law, or violate their faith." *Id.* at ¶ 133. If Hobby Lobby fails to provide the mandated coverage, plaintiffs contend the corporation will incur penalties of about $1.3 million a day. Mardel also will be fined if it does not comply with the mandate. Plaintiffs seek a preliminary injunction to prevent defendants from enforcing the mandate against them,

_____

*complaint alleges only voting control. The distinction does not affect the disposition of the pending motion.*

5

arguing that the mandate violates their right to free exercise of religion under the First Amendment and their statutory rights under the Religious Freedom Restoration Act of 1993. ("RFRA"), 42 U.S.C. § 2000bb-1.

<u>Legal Standard</u>

A preliminary injunction is an extraordinary remedy and should "not be issued unless the movant's right to relief is 'clear and unequivocal.'" <u>Heideman v. South Salt Lake City</u>, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting <u>Kikumura v. Hurley</u>, 242 F.3d 950, 955 (10th Cir. 2001). To obtain a preliminary injunction the moving party must establish that:

> (1) [the movant] will suffer irreparable injury unless the injunction issues; (2) the threatened injury ... outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood [of success] on the merits.

*Id.* (quoting <u>Resolution Trust Corp. v. Cruce</u>, 972 F.2d 1195, 1198 (10th Cir.1992). Plaintiffs, as the movants, have the burden of demonstrating that each factor tips in their favor. *Id.* at 1188-89.

The Tenth Circuit has applied a relaxed "probability of success" requirement when the moving party has "established that the three 'harm' factors tip *decidedly* in its favor." *Id.* at 1189. The movant in such cases "need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation." *Id.* (internal quotations omitted). Plaintiffs urge application of the "'less rigorous fair-ground-for-litigation standard.'" <u>Heideman</u>, 348 F.3d at 1189 (quoting <u>Sweeney v. Bane</u>, 996 F.2d 1384, 1388 (2d Cir.1993)).

6

The relaxed standard does not apply if the injunction "is one that alters the status quo and therefore is disfavored." <u>Northern Natural Gas Co. v. L.D. Drilling, Inc.</u>, ___ F.3d ___, ___ , 2012 WL 4902833 at *4 (10th Cir. 2012).  Defendants argue that plaintiffs are not seeking to maintain the status quo because, prior to the enactment of the mandate,  Hobby Lobby provided coverage for emergency contraceptives that could cause an abortion.  The court is not persuaded that the coverage was due to anything other than a mistake.  Upon discovery of the coverage,  Hobby Lobby immediately excluded the two drugs, Plan B and Ella, from its prescription drug policy.  Defendants do not dispute that the company's policies have otherwise long excluded  abortion-inducing drugs. Here plaintiffs are not seeking a disfavored injunction, but rather ask the court to preserve the status quo.

The court agrees with plaintiffs that the questions presented here are "serious, substantial, difficult and doubtful."  However, an additional limitation on the applicability of the "less rigorous fair-ground-for-litigation standard" exists. The Tenth Circuit has concluded the "'liberal definition of the 'probability of success' requirement'" does not apply "'where a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme.'" <u>Nova Health Systems v. Edmondson</u>, 460 F.3d 1295, 1298  n.6 (10th Cir. 2006) (quoting <u>Heideman</u>, 348 F.3d at 1189).[7]  Here, plaintiffs challenge a regulatory requirement imposed pursuant to a statutory or regulatory

---

[7]*Defendants argue that in <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7 (2008),  the Supreme court abrogated the more flexible standard for the preliminary injunction. The court does not have to reach that issue, due to its conclusion that, because plaintiffs are seeking to enjoin the enforcement of an action taken, pursuant to a statutory scheme, they "must meet the traditional substantial likelihood of success' standard." <u>Nova Health Systems</u>, 460 F.3d at 1298 n.6.*

scheme.  As a result, the more liberal "fair ground for litigation" standard does not apply.

One court in this circuit has reached a contrary conclusion.[8]  In <u>Newland v. Sebilius</u>, ___F.Supp.2d ___ , 2012 WL 3069154 (D.Colo. 2012), a factually similar case, the court concluded the relaxed "likelihood of success" standard should be applied because the "government's creation of numerous exceptions to the preventive care coverage mandate has undermined its alleged public interest." *Id.* at 2012 WL 3069154, at *5.   However, for purposes of determining the appropriate preliminary injunction standard, the question is not whether the public interest is strong or compelling, but rather whether it is in the public interest at all.  And as to that question, the court is obliged to defer to the determination of Congress.  As the Tenth Circuit observed in a somewhat similar context, applying the <u>Heideman</u> rule, "we presume that all governmental action pursuant to a statutory scheme is 'taken in the public interest.'" <u>Aid for Women v. Foulston</u>, 441 F.3d 1101, 1115 n. 15 (10th Cir. 2006)(more relaxed standard inapplicable to plaintiff's challenge to a Kansas statute requiring reporting of minors' voluntary sexual activity).  In like manner, this court presumes the challenged government actions at issue here are taken in the public interest within the meaning of the <u>Heideman</u> standard, notwithstanding the existence of exceptions to the coverage requirement.[9]

---

[8]*Two district courts in other circuits have issued preliminary injunctions in similar cases, employing different standards than those adopted by the Tenth Circuit.  See <u>Legatus v. Sebelius</u>, ___ F.Supp.2d ___, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012) and <u>Tyndale House Publishers, Inc. v. Sebelius</u>, ___ F.Supp.2d ___, 2012 WL 5817323 (D.D.C. Nov. 16, 2012).*

[9]*And, as noted above, the presumption is made without regard to the court's owns views of whether the ACA or the particular regulatory requirements at issue are sound public policy.*

Similarly unpersuasive is plaintiff's argument that the more flexible preliminary injunction standard applies here because they are not attacking the entire statutory scheme, just a small part of it.  First, the Heideman exception, as articulated by the Tenth Circuit, does not require the challenge to be to an entire statutory scheme.  Instead, it refers to attempts to "stay governmental action taken in the public interest" that is "pursuant to a statutory or regulatory scheme."   Heideman, 348 F.3d at 1189 (internal quotations omitted).  The mandate at issue here is both (1) an action in the public interest, as determined by Congress, and (2) one taken pursuant to the statute.  That is all that is required.  Moreover, none of the cases plaintiffs cite offer any explicit support for their view and at least some of them clearly involve challenges to less than a whole "scheme."  For example, in Foulston, the challenge was not to the entire scheme (which imposed a reporting requirement on various professionals for instances of physical, mental or emotional abuse or neglect or sexual abuse of a child), but to a limited aspect of it (mandatory reporting of consensual sex between minors).

As plaintiffs are challenging a coverage requirement imposed as part of a regulatory or statutory scheme, the "fair ground for litigation standard" does not apply.  To obtain injunctive relief, they must show a substantial likelihood of success on the merits, in addition to the standard's three other requirements.  The requirement for showing a substantial likelihood of success on the merits is determinative of the present motion for the reasons which follow.

First Amendment – Free Exercise of Religion

The First Amendment's Free Exercise Clause states that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." Plaintiffs maintain they exercise their religion by complying with their religious beliefs which prohibit them from providing coverage, or access to coverage, for abortion-causing drugs or devices or related education and counseling. The mandate forces them, plaintiff's argue, to violate their religious beliefs and substantially burdens their religious exercise.

The question of whether plaintiffs are likely to prevail on their constitutional claims requires a threshold determination of whether the particular plaintiffs have constitutional "free exercise" rights subject to being violated. As to the Greens, the answer to that is obviously yes. However, as to the corporations — Hobby Lobby and Mardel — the court concludes otherwise.

Corporations have constitutional rights in some circumstances, such as the right to free speech, but the rights of corporate persons and natural persons are not coextensive. Courts have not extended all constitutional rights to all corporations. Corporations do not possess a "right to exercise a privilege against self-incrimination." Application to Enforce Admin.Subpoenas Duces Tecum of the § v. Knowles, 87 F.3d 413, 416 n.3 (10th Cir.1996), They have been denied "[c]ertain 'purely personal' guarantees ... because the 'historic function' of the particular guarantee has been limited to the protection of individuals." First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 778 n. 14 (1978) (citing United States v. White, 322 U.S. 694, 698-701 (1944)). "Whether or not a particular guarantee is 'purely personal' or is unavailable to corporations for some other reason depends on the nature,

history, and purpose of the particular constitutional provision." *Id.*

The purpose of the free exercise clause is "to secure religious liberty in the <u>individual</u> by prohibiting any invasions thereof by civil authority." <u>Sch. Dist. of Abington Twp. v. Schempp</u>, 374 U.S. 203, 223 (1963) (emphasis added).  Churches and other religious organizations or religious corporations have been accorded protection under the free exercise clause, *see* <u>Hosanna–Tabor Evangelical Lutheran Church & Sch. v. EEOC</u>, ___ U.S.___, ___, 132 S.Ct. 694, 706 (2012); <u>Lukumi</u>, 508 U.S. at 531-32, because believers "exercise their religion through religious organizations." <u>Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos</u>, 483 U.S. 327, 341 (1987) (BRENNAN, J. concurring) (internal quotations omitted).  However, Hobby Lobby and Mardel are not religious organizations.  Plaintiffs have not cited, and the court has not found, any case concluding that secular, for-profit corporations such as Hobby Lobby and Mardel have a constitutional right to the free exercise of religion.  *See* <u>Anselmo v. Cnty. of Shasta</u>, ___ F.Supp.2d ___, 2012 WL 2090437, at *12 (E.D.Cal 2012) ("Although corporations and limited partnerships have broad rights, the court has been unable to find a single RLUIPA case protecting the religious exercise rights of a non-religious organization such as Seven Hills.").[10]  The court concludes plaintiffs Hobby Lobby and Mardel do not have constitutional free exercise rights as corporations and that they therefore cannot show a likelihood of success as to any

---

[10]*The court has considerable doubt whether the corporations would have standing to assert a claim on behalf of the Greens.  See generally* <u>Grace</u>,*451 F.3d at 670 (discussing prerequisites for associational standing as stated by the Supreme Court in* <u>Hunt v. Washington State Apple Adver. Comm'n</u>, *432 U.S. 333, 343 (1977) ).  However, as the Greens are parties appearing and asserting their own rights, it is unnecessary to belabor the issue.*

constitutional claims they may assert. Plaintiffs' ability to show a likelihood of success therefore depends on evaluation of the claims of the individual plaintiffs — the Greens.

The question of whether the Greens can establish a free exercise constitutional violation by reason of restrictions or requirements imposed on general business corporations they own or control involves largely uncharted waters. However, the court concludes it is unnecessary, as to the constitutional claims, to resolve those questions here as the challenged statutory scheme and regulations are substantially likely to survive constitutional scrutiny in any event.

"While the First Amendment provides absolute protection to religious thoughts and beliefs, the free exercise clause does not prohibit Congress and local governments from validly regulating religious conduct." Grace United Methodist Church v. City Of Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006). "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" Emp't Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 879 (1990) (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in judgment)). If a law is both neutral and generally applicable, it only has to be "rationally related to a legitimate governmental interest to survive a constitutional challenge." Grace, 451 F.3d at 649. A law that burdens a religious practice and is not neutral or generally applicable is subject to strict scrutiny. Id. "[U]nless it is narrowly tailored to advance a compelling governmental interest," the law violates the Free Exercise Clause. Id.

To analyze plaintiffs' free exercise claims the court must first determine the level of scrutiny to apply.  *Id.*  A law is neutral if its object is "something other than the infringement or restriction of religious practices."  *Id.* at 649-50.  Citing <u>Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah</u>, 508 U.S. 520 (1993), plaintiffs argue that the mandate is not neutral because it exempts some religious employers from compliance while compelling others to provide coverage for preventive services.  They contend it discriminates between religious objectors, exempting "only organizations whose 'purpose' is to inculcate religious values; who 'primarily' employ and serve co-religionists; and who qualify as churches or religious orders under the tax code."  Plaintiffs' motion, p. 18,

Carving out an exemption for defined religious entities does not make a law nonneutral as to others.  Plaintiffs do not allege that "the <u>object</u> of [the mandate] is to infringe upon or restrict practices because of their religious motivation."  <u>Lukumi</u>, 508 U.S. at 533 (emphasis added);[11] *see* <u>Grace</u>, 451 F.3d at 649-50.  They do not dispute that the mandate's purpose is secular in nature and intended to promote public health and gender equality. "[T]here is no evidence that the exception is in any way based on religious categorization or discrimination."  <u>Grace</u>, 451 F.3d at 652 (quoting <u>Swanson v. Guthrie Indep. Sch. Dist. No. I-L</u>, 135 F.3d 694, 701 (10th Cir.1998)); *see* <u>Axson-Flynn v. Johnson</u>, 356 F.3d 1277, 1294 (10th Cir. 2004) ("A rule that is discriminatorily motivated and applied is not a neutral rule of general applicability.");<u>Corder v. Lewis Palmer Sch. Dist. No. 38</u>, 566 F.3d 1219, 1232-33

---

[11]*Plaintiffs also do not argue that the preventive care coverage regulations lack "facial neutrality." See  <u>Lukumi</u>, 508 U.S. at 533.*

(10th Cir. 2009); <u>Catholic Charities of Diocese of Albany v. Serio</u>, 859 N.E.2d 459, 464

(N.Y. 2006).  In fact, the religious employer exemption and the safe harbor provision suggest

the opposite of what plaintiffs argue and must show to warrant strict scrutiny of the mandate.

Using well established criteria to determine eligibility for an exemption based on religious

belief, such as the nonsecular nature of the organization and its nonprofit status, the ACA,

through its implementing rules and regulations, both recognizes and protects the exercise of

religion.  The fact that the exceptions do not extend as far as plaintiffs would like does not

make the mandate nonneutral.  <u>O'Brien v. United States Dep't of Health and Human Servs.</u>,

___ F.Supp.2d ___, ___, 2012 WL 4481208, at *8 (E.D. Mo. 2012) ("[T]he religious

employer exemption does not compromise the neutrality of the regulations by favoring

certain religious employers over others.  Rather . . . the religious employer exemption

presents a strong argument in favor of neutrality . . . .").  As the New York Court of Appeals

explained in <u>Serio</u>, a case involving a free exercise challenge to a state law requiring

employers providing coverage for prescription drugs to include coverage for contraceptives:

> The neutral purpose of the challenged portions of the [health care law]—to
> make contraceptive coverage broadly available to New York women—is not
> altered because the Legislature chose to exempt some religious institutions and
> not others. To hold that any religious exemption that is not all-inclusive
> renders a statute non-neutral would be to discourage the enactment of any such
> exemptions—and thus to restrict, rather than promote, freedom of religion.

<u>Serio</u>, 859 N.E. 2d at 464.  "[T]he neutrality inquiry leads to one conclusion: The [preventive

services coverage regulations] [did not have] as their object the suppression of religion."

<u>Lukumi</u>, 508 U.S. at 542.

The second requirement of the constitutional test is that "laws burdening religious practice must be of general applicability." *Id.* "The Free Exercise Clause protect[s] religious observers against unequal treatment, and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542-43 (internal citation and quotations omitted).

Plaintiffs contend the mandate is not generally applicable because of the numerous exemptions, including those for grandfathered plans and religious employers. However, the mandate does not "pursue[] ... governmental interests only against conduct motivated by religious belief." *Id.* at 545. As the court noted in O'Brien, 2102 WL 4481208, at *8, "[t]he regulations in this case apply to all employers not falling under an exemption, regardless of those employers' personal religious inclinations." *See* Stormans, Inc. v. Selecky, 586 F.3d 1109, 1134 (9th Cir. 2009) ("Pharmacies and pharmacists who do not have a religious objection to Plan B must comply with the rules to the same extent—no more and no less—than pharmacies and pharmacists who may have a religious objection to Plan B. Therefore, the rules are generally applicable.").

As the court concludes the mandate is neutral and of general applicability, it is subject only to rational basis scrutiny under the First Amendment. Smith, 494 U.S. at 883-85. Plaintiffs do not argue that there is no legitimate government interest for the mandate or that the regulations are not rationally related to protect that interest, and the court finds no basis on the present showing to conclude the law, under the rational basis test, is unconstitutional.

Applying these principles, the court concludes plaintiffs have not established a

likelihood of success as to their constitutional claims.  The corporations lack free exercise rights subject to being violated and, as the challenged statutes/regulations are neutral and of general applicability as contemplated by the constitutional standard, plaintiffs are unlikely to successfully establish a constitutional violation in any event.

Religious Freedom Restoration Act

Plaintiffs' claims under the Religious Freedom Restoration Act of 1993 present a closer question.  RFRA applies standards which are more protective of religious exercise than the constitutional standard.  It prohibits the federal government from substantially burdening a person's exercise of religion, unless the government demonstrates that application of the burden to the person is the least restrictive means of furthering a compelling governmental interest.  42 U.S.C. § 2000bb-1;  Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 424 (2006).  The Act "provides a statutory claim to individuals whose religious exercise is burdened by the federal government." United States v. Wilgus, 638 F.3d 1274, 1279 (10th Cir. 2011). Congress passed RFRA to restore the compelling interest test that had been applied to laws substantially burdening religious exercise before the Supreme Court's decision in Smith.

RFRA provides that:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if
it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental
interest.

42 U.S.C. § 2000bb–1.

As was the case with plaintiffs' constitutional claims, a threshold question here is
whether all the plaintiffs are in a position to assert rights under RFRA.  That depends on
whether particular plaintiffs qualify as a "person" within the meaning of the statute.  The
Greens are unquestionably "persons" under the statute, entitled to assert its potential
application to them.  Less clear is the status of Hobby Lobby and Mardel.

RFRA does not include a specific definition of "person."  Plaintiffs argue that Hobby
Lobby and Mardel qualify as "persons" based on the general definition included in 1 U.S.C.
§ 1.  That section provides: "In determining the meaning of any Act of Congress, unless the
context indicates otherwise ... the words 'person' and 'whoever' includes corporations ... as
well as individuals."  As used in § 1, "'[c]ontext' . . . means the text of the Act of Congress
surrounding the word at issue, or the texts of other related congressional Acts, and this is
simply an instance of the word's ordinary meaning . . . ."  Rowland v. Cal. Men's Colony, 506
U.S. 194, 199 (1993).  While context "has a narrow compass, the 'indication' contemplated
by 1 U.S.C. § 1 has a broader one."  *Id.* at 200.  The qualification "unless the context
indicates otherwise," is intended to assist the court "in the  awkward case where Congress
provides no particular definition, but the definition in 1 U.S.C. § 1 seems not to fit."  *Id.*  That

17

is the situation here. General business corporations do not, separate and apart from the actions or belief systems of their individual owners or employees, exercise religion.  They do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors.  Religious exercise is, by its nature, one of those "purely personal" matters referenced in <u>Bellotti</u> which is not the province of a general business corporation.  As applied to 1 U.S.C. § 1 and the question of whether these corporations are "persons" within the meaning of RFRA, the context "indicates otherwise."

"Plaintiffs assert that "[i]t is settled law that corporations may exercise religion." Plaintiffs' reply, p. 8.  However, the cases they cite, <u>Gonzales</u> and <u>Lukumi</u> involved religious organizations, not general business corporations.[12]  The same reasons behind the court's conclusion that secular, for-profit corporations do not have First Amendment rights under the Free Exercise Clause support a determination that they are not "persons" for purposes of the RFRA.[13]  This conclusion is buttressed by RFRA's reference to principles of standing:

---

[12]*Centro Espirita Beneficiente Uniao do Vegetal is described in <u>Gonzales</u> as a religious sect. There is no indication it was incorporated.  The church in <u>Lukumi</u> was a non-profit corporation, 508 U.S. at 525, and nothing in <u>Gonzales</u> indicates the religious sect operated a secular, for profit business. Plaintiffs also cite  <u>Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty.</u>, 450 F.3d 1295 (11th Cir.2006) for the proposition that a commercial corporation's rights can include religious exercise.  However, in resolving the issue of whether the plaintiff had standing to assert a violation of free exercise rights under the First Amendment, the Eleventh Circuit stated: "we easily conclude that Primera, as an incorporated religious organization, stated a section 1983 claim for the alleged violation of its ... free exercise rights." Id. at 1306.*

[13]*Plaintiffs argue that "the Supreme Court has at least twice allowed commercial proprietors to assert religious exercise claims against regulations impacting their businesses," citing <u>United States v. Lee</u>, 455 U.S. 252 (1982) and <u>Braunfeld v. Brown</u>, 366 U.S. 599 (1961).  Plaintiffs' reply,*

"Standing to assert a claim or defense under this section shall be governed by the general rules of standing under Article III of the Constitution."  42 U.S.C. § 2000bb-1(c).

In any event, the court concludes that plaintiffs have not established a likelihood of success as to any claims asserted by Hobby Lobby and Mardel under RFRA.  The question then becomes whether plaintiffs have established a likelihood of success as to the RFRA claims of the Greens.

"[A] plaintiff establishes a prima facie claim under RFRA by proving the following three elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion."[14]  Kikumura v. Hurley, 242 F.3d 950, 960 (10th Cir. 2001).  Once the plaintiff establishes these elements, "the burden shifts to the government to demonstrate

---

*p. 4 . However, neither case appears to have involved a corporation and, in any event, it is clear that the religious beliefs that were allegedly being interfered with were those of the owners.  Braunfeld, 366 U.S. at 601 ("[T]he only question for consideration is whether the statute interferes with the free exercise of appellants' religion. . . . Each of the appellants is a member of the Orthodox Jewish faith.").  Plaintiffs also rely on  two Ninth Circuit cases, Storman's, Inc. v. Selecky, 586 F.3d 1109 (9th Cir. 2009) and EEOC v. Townley Eng'g & Mfg. Co., 859 F.2d 610 (9th Cir. 1988).  Neither supports their argument.  In Storman's, 586 F.3d at 1119, the Ninth Circuit stated "We decline to decide whether a for-profit corporation can assert its own rights under the Free Exercise Clause and instead examine the rights at issue as those of the corporate owners."  Similarly, in Townley, 859 F.2d at 619-20, the court stated: " Because Townley is merely the instrument through and by which Mr. and Mrs. Townley express their religious beliefs, it is unnecessary to address the abstract issue whether a for profit corporation has rights under the Free Exercise Clause independent of those of its shareholders and officers. Townley presents no rights of its own different from or greater than its owners' rights.") .*

*[14]The term "religious exercise" is broadly defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); 42 U.S.C. § 2000bb-2(4); see generally  Smith, 494 U.S. at 877 ("But the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation.").*

that 'application of the burden' to the claimant 'is in furtherance of a compelling governmental interest' and 'is the least restrictive means of furthering that compelling governmental interest.'"   *Id.* at 961-62 (quoting 42 U.S.C. § 2000bb–1(b));   Gonzales, 546 U.S. at 428-30.

The second and third elements of plaintiffs' prima facie case are not in dispute.  No one questions that the Greens' beliefs are sincerely held or that the mandate burdens, at least indirectly, the Greens' "own exercise of [their] sincerely held religious beliefs."[15] Abdulhaseeb v. Calbone, 600 F.3d 1301, 1314 (10th Cir. 2010), *cert. denied,* ___ U.S. ___ (2010).  The critical question is whether the mandate imposes a "substantial" burden on the Greens for purposes of the RFRA.  Defendants contend that any burden the mandate imposes on the Greens is indirect, "result[ing]s from obligations that the preventive services coverage regulations impose on a legally separate, secular entity."  Defendants' response, pp. 18-19. They argue that "[t]his type of attenuated burden is not cognizable under the RFRA."  *Id.* at p. 19. Plaintiffs counter that defendants' "attenuation argument rewrites their faith.  The government may not, they contend "re-draw the theological lines in religious belief systems." Plaintiffs' reply, p. 13.  They contend the mandate substantially burdens their religious exercise "by forcing them to choose between following their convictions and paying enormous fines."  Plaintiffs' motion, p. 9.

The present circumstances require charting a course through the "treacherous terrain"

---

[15]*Plaintiffs assert that they "exercise religion by avoiding participation in abortion, an act forbidden by their faith.  Plaintiffs' reply, p. 3.*

at the intersection of the federal government's duty to avoid imposing burdens on the individual's practice of religion and the protection of competing interests. *See* <u>Wilgus</u>, 638 F.3d at 1281.  No Supreme Court or Tenth Circuit authority applying or discussing RFRA's "substantial burden" requirement does so in circumstances like those present here — where regulatory requirements applicable to a general business corporation are alleged to infringe on the religious exercise rights of the corporation's owners or officers.  Similarly, the cases decided under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc-2000cc-5, which applies essentially the same standard,[16] do not provide specific guidance.  However, certain principles emerge from the cases which guide the court's determination.

First, it is clear, as plaintiffs argue, that it is not the province of the court to tell the plaintiffs what their religious beliefs are, i.e. whether their beliefs about abortion should be understood to extend to how they run their corporations or the like, or to decide whether such beliefs are fundamental to their belief system or peripheral to it.  RFRA makes clear it does not matter whether the particular exercise of religion at issue is or is not central to the individual's religious beliefs.  42 U.S.C. § 2000cc-5(7)(A); *see* <u>Abdulhaseeb</u>, 600 F.3d at 1314 at n.6.  Nonetheless, even assuming, as appears to be the case with plaintiffs, that they object as a matter of religious faith to any act supporting or facilitating abortion, no matter

---

[16]*RLUIPA cases are instructive as "RLUIPA's legislative history reveals that 'substantial burden' is to be interpreted by reference to the Religious Freedom Act of 1993 ... and First Amendment jurisprudence."* <u>*Grace*</u>*, 451 F.3d at 661 (citing 146 Cong. Rec. 7774-01, 7776).*

how indirect, that does not end the issue.  RFRA's provisions do not apply to <u>any</u> burden on

religious exercise, but rather to a "substantial" burden on that exercise.  As the Seventh

Circuit observed in <u>Civil Liberties for Urban Believers v. City of Chicago</u>, 342 F.3d 752 (7th

Cir. 2003):

> Application of the substantial burden provision to a regulation inhibiting or
> constraining *any* religious exercise, including the use of property for religious
> purposes, would render meaningless the word "substantial," because the
> slightest obstacle to religious exercise incidental to the regulation of land use -
> however minor the burden it were to impose - could then constitute a burden
> sufficient to trigger RLUIPA's requirement that the regulation advance a
> compelling governmental interest by the least restrictive means.[17]

342 F.3d 752, 761.  Recognizing that the word "substantial" must have some meaning, the

<u>Civil Liberties</u> court went on to conclude that

> [I]n the context of RLUIPA's broad definition of religious exercise, a ...
> regulation that imposes a substantial burden on religious exercise is one that
> <u>necessarily bears direct, primary and fundamental</u> responsibility for rendering
> religious exercise ... impracticable.

*Id.* (emphasis added).  <u>Civil Liberties</u> thus concludes, in general, that a "substantial burden"

on religious exercise is one that bears in some relatively direct manner on it.

The view of substantial burden adopted by the Seventh Circuit in <u>Civil Liberties</u> is not

the only approach that has emerged.  *See* <u>Adkins v. Kaspar</u>, 393 F.3d 559, 567-71(5th Cir.

2004) (discussing cases); <u>Living Water Church of God v. Charter Twp. of Meridian</u>, 258

Fed.Appx. 729, 2007 WL 4322157 at 6-8 (6th Cir. 2007) (unpublished) (discussing cases).

---

[17]*<u>Civil Liberties</u> was decided under RLIUPA but, as noted above, RLIUPA's standards for
what constitutes a "substantial burden" are the same as RFRA's.*

However, the Tenth Circuit has cited <u>Civil Liberties</u> with approval in the context of determining what constitutes a "substantial burden," <u>Grace</u>, 451 F.3d at 661, suggesting that it shares the view that some level of "directness" must be present.  The Tenth Circuit has, of course, also noted that a substantial burden may, in some circumstances, be based on compulsion that is indirect.  <u>Abdulhaseeb</u>, 600 F.3d at 1315; *see also* <u>Thomas v. Review Bd. of Ind. Employment Sec. Div.</u>, 450 U.S. 707 (1981).  Giving effect to both principles, the result appears to be that, while no bright line rule has been stated by the Supreme Court or the Tenth Circuit (or perhaps could be, in this context), the degree to which the challenged government action operates directly and primarily on the individual's religious exercise is a significant factor to be evaluated in determining whether a "substantial burden" is present.

Evaluating the "directness" factor here, the court concludes the Greens are unlikely to be able to establish a "substantial burden" on them within the meaning of RFRA.  The mandate in question applies only to Hobby Lobby and Mardel, not to its officers or owners.  Further, the particular "burden of which plaintiffs complain is that funds, which plaintiffs will contribute to a group health plan, might, after a series of independent decisions by health care providers and patients covered by [Hobby Lobby's] plan, subsidize <u>someone else's</u> participation in an activity that is condemned by plaintiff's religion."  <u>O'Brien</u>, 2012 WL 4481208, at *6.  Such an indirect and attenuated relationship appears unlikely to establish the necessary "substantial burden."

Other cases decided by the Tenth Circuit under RFRA/RLUIPA are consistent with the view that some reasonably direct and personal connection between the religious exercise

and the restraint in question must be present.  In <u>Abdulhaseeb</u>, the restriction in question directly impacted the religious exercise of the plaintiff by denying him the diet that was necessary to his religious beliefs.  In <u>Wilgus</u>, the defendant personally possessed the eagle feathers.  In <u>Kikumura</u>, the prisoner was denied pastoral visits by a minister he claimed was particularly well suited to provide him with spiritual guidance.

Similarly, the principal Supreme Court case construing RFRA, <u>Gonzales</u>, also involved a close or personal connection between the religious exercise and the infringing government action.  The religious sect in <u>Gonzales</u> was prohibited from engaging in communion.  Its members were faced with the choice of foregoing a religious sacrament or violating the Controlled Substances Act.

Consideration of Supreme Court decisions addressing the constitutional standard in this area also provides some support for the view that the necessary "substantial burden" is unlikely to be established here.  <u>Grace</u> notes that the legislative history of RFRA and RLUIPA indicates that the term "substantial burden" should not be given a broader interpretation that the Supreme Court's articulation of the concept.  <u>Grace</u>, 451 F.3d at 661. *See* <u>O'Brien</u>, 2012 WL 4481208 at *5 ("Courts frequently look to free exercise cases predating <u>Employment Div. v. Smith</u> to determine which burdens cross the threshold of substantiality"); <u>Anselmo</u>, 2012 WL 2090437, at *8 ("The Ninth Circuit has explained that the Supreme Court's free exercise jurisprudence ... is instructive in defining a substantial burden under RLUIPA . . . .") (quoting <u>Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter</u>, 456 F.3d 978, 988 (9th Cir.2006)).  As with the Tenth Circuit cases, the Supreme

Court decisions have also involved situations where the restraint in question operated with some level of directness on the individual.  For example, the plaintiff in <u>Sherbert v. Verner</u>, 374 U.S. 398 (1963), was forced "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand."  374 U.S. at 404.  The compulsory attendance law at issue in <u>Yoder</u>, 406 U.S. 205 (1972), required the Amish plaintiffs to elect between "abandon[ing] belief and be[ing] assimilated into society at large, or be[ing] forced to migrate to some other and more tolerant region."  406 U.S. at 218.  In <u>Thomas</u>, the employee's personal participation in activity to which he objected was involved.

Finally, the court notes the Supreme Court's approach in <u>Lee</u>.  Although <u>Lee</u> was a free exercise case and focused principally on the nature and application of the compelling interest test, its discussion of the impact of commercial activity provides some guidance on the issue of what constitutes a "substantial burden."  The Court noted that "every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs."  <u>Lee</u>, 455 U.S. at 261.  The plain import is that there must be more than some burden on religious exercise.  The burden must be substantial.  The Court then went on to state that

> [w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity. Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees. Congress drew a line in § 1402(g), exempting the self-employed Amish but not all persons working for an Amish employer.

455 U.S. at 261.  The Court's discussion reflected a concern with the impact of the employer's faith-based decisions on his employees.  While that appears not to have been a matter critical in <u>Lee</u>, as Lee's employees were also Amish, it would be potentially significant here.  Hobby Lobby and Mardel employ over 13,500 people and "welcome[] employees of all faiths or no faith."  Complaint, ¶ 51.  Many of those employees are likely to have different religious views.  Moreover, the employees' rights being affected are of constitutional dimension — related to matters of procreation, marriage contraception, and abortion.[18]  While such considerations (and the discussion in <u>Lee</u> referenced above) go most directly to a determination of whether a compelling governmental interest is shown in a particular circumstance, rather than to what is here the determinative issue — what constitutes a "substantial burden" — they nonetheless suggest that term should be given meaningful application.

   In sum, while the meaning and reach of the term "substantial burden" in this context is considerably less than crystal clear, it appears to impose a requirement that the burden on religious exercise be more direct and personal than has been shown here as to the Greens and their management of nationwide general business corporations.

───────────────

   [18]*The matter of a constitutional right to abortion has been highly controversial since the right was discovered among the penumbras of the Due Process Clause some forty years ago.  <u>Roe v. Wade</u>, 410 U.S. 113, 93 S.Ct. 705 (1973).  Nonetheless, the right is now clearly established and necessarily shapes the nature of the rights and interests of plaintiffs' employees.  See <u>Gonzales v. Carhart</u>, 550 U.S. 124(2007); <u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 U.S. 833 (1992).*

<u>Conclusion</u>

Plaintiffs have not shown a "clear and unequivocal" right to injunctive relief in light of the standards applicable to their request.  <u>Heideman</u>, 348 F.3d at 1188 (internal quotations omitted).  The court is not unsympathetic to plaintiffs' circumstances and recognizes that the ACA's substantial expansion of employer obligations results in concerns and issues not previously confronted by companies or their owners.  However, for the reasons previously stated, the court concludes plaintiffs have not made the necessary showing of a likelihood of success on the merits to warrant a preliminary injunction in the circumstances existing here.

Plaintiffs have not demonstrated a probability of success on their First Amendment claims.  Hobby Lobby and Mardel, secular, for- profit corporations, do not have free exercise rights.  The Greens do have such rights, but are unlikely to prevail as to their constitutional claims because the preventive care coverage regulations they challenge are neutral laws of general applicability which are rationally related to a legitimate governmental objective.

Plaintiffs also have failed to demonstrate a probability of success on their Religious Freedom Restoration Act claims.  Hobby Lobby and Mardel are not "persons" for purposes of the RFRA and the Greens have not established that compliance with the preventive care coverage regulations would "substantially burden" their religious exercise, as the term "substantially burdened" is used in the statute.  Therefore, plaintiffs have not met their prima facie burden under RFRA and have not demonstrated a probability of success as to their

RFRA claims.[19]   Accordingly, the motion for preliminary injunction [Doc. #6] is **DENIED**.

**IT IS SO ORDERED**.

Dated this 19th day of November, 2012.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[19]*Because plaintiffs have not demonstrated a substantial likelihood of success on the merits, it is unnecessary to determine whether the three other factors tip in their favor.*